1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                  HOUSTON DIVISION

4   USA                          §   CASE NO. 4:24-cr-00448-4
                                 §   HOUSTON, TX
5   VERSUS                       §   TUESDAY,
                                 §   SEPTEMBER 3, 2024
6   JARED ROBLEDO, et al.        §   1:42 PM to 3:00 PM

7                      HEARING

8        BEFORE THE HONORABLE CHRISTINA BRYAN
             UNITED STATES MAGISTRATE JUDGE

9                    APPEARANCES:

10

11      FOR THE PARTIES:              SEE NEXT PAGE

12      ELECTRONIC RECORDING OFFICER: CHRISTOPHER RODRIGUEZ

13      COURT CLERK:                  MELISSA MORGAN

14

15

16

17

18

19

20

21              TRANSCRIPTION SERVICE BY:

22              Veritext Legal Solutions
             330 Old Country Road, Suite 300
23                 Mineola, NY 11501
             Tel: 800-727-6396 ▼ www.veritext.com

24

25   Proceedings recorded by electronic sound recording; transcript
              produced by transcription service.

1                                APPEARANCES:

2   FOR THE PLAINTIFF                DOJ-CRM
    USA:                             Amy L. Schwartz
3                                    1301 New York Avenue NW
                                     Suite 750
4                                    Washington, D.C. 20001
                                     202-616-1489
5

6                                    DOJ-USAO
                                     Anhkhoa Thien Tran
7                                    Department of Justice
                                     1000 Louisiana Street, Suite 2300
8                                    Houston, TX 77002
                                     713-567-9551
9
                                     DOJ-TAX
10                                   George Meggali
                                     150 M Street NE
11                                   Washington, D.C. 20002
                                     202-598-5969
12

13  FOR THE DEFENDANT                THE ESSMYER LAW FIRM
    JARED ROBLEDO:                   Michael M. Essmyer, Sr.
14                                   6602 Westview Drive
                                     Houston, TX 77055
15                                   281-768-7201

16  FOR THE DEFENDANT                ADRIAN ALMAGUER ATTORNEY AT LAW
    JOSE ALEX LOPEZ:                 Adrian Almaguer
17                                   P.O. Box 262406
                                     Houston, TX 77207
18                                   713-861-1392

19  FOR THE DEFENDANT                THE SPARKS LAW FIRM
    A'LAN TINGLE                     Monique Chantelle Sparks
20                                   1923 Blodgett Street
                                     Houston, TX 77004
21                                   713-520-7000

22  FOR THE DEFENDANT                VINAS AND GRAHAM, PLLC
    TANAUSU MADRIGAL:                Joseph Francis Vinas
23                                   1210 West Clay Street, Suite 12
                                     Houston, TX 77019
24                                   713-229-9992

25

1          HOUSTON, TEXAS; TUESDAY, SEPTEMBER 3, 2024; 1:42 PM

2          CLERK:  All right.  Next case.  United States v, Jose

3    Alex Lopez, Alan Tingle, Jared Robledo, and Tanausu Madrigal.

4          THE COURT:  All right, Counsel, can I have you

5    announce your appearances, please?

6          MR. ALMAGUER:  Yes.  Good afternoon, Your Honor.

7    Adrian Almaguer for Mr. Jose Lopez.

8          THE COURT:  Thank you, Mr. Almaguer.

9          MS. SPARKS:  Good afternoon, Your Honor.  Monique

10   Sparks for Mr. Alan Tingle.

11         THE COURT:  Thank you, Ms. Sparks.

12         MR. ESSMYER:  Michael M. Essmyer, Sr. for Mr. Jared

13   Robledo.

14         THE COURT:  Thank you.

15         MR. VINAS:  Good afternoon, Your Honor.  Joe Vinas

16   for Mr. Madrigal.

17         THE COURT:  All right, thank you.  Is everyone going

18   forward with detention hearing?

19         MR. VINAS:  We are, Your Honor, Mr. Madrigal's --

20         MS. SPARKS:  We are, yes.

21         MR. ALMAGUER:  I am not, Your Honor.  The government

22   has just filed a motion for the Court to waive the ten-day

23   period for us to be able to review the wiretap and they just

24   yesterday afternoon, they sent out 529 pages wiretap

25   applications and affidavits that I have not had the opportunity

1   to complete reviewing.  And I understand that that the Court

2   only has ten days for detention hearing, but I think that that

3   could be waived for good cause and I believe that that's good

4   cause.

5           THE COURT:  Well, it's (indiscernible) five days but

6   you can ask -- for good cause you can get a continuance.

7           MR. ALMAGUER:  Yes, Your Honor.

8           THE COURT:  Yes.

9           MR. ALMAGUER:  But (indiscernible) until next Tuesday

10  would be the earliest that I could be here.

11          THE COURT:  Let me hear counsel for the United

12  States.

13          MS. SCHWARTZ:  Amy Schwartz representing the United

14  States.  As to Mr. Lopez, the United States does not object to

15  Mr. Lopez's request to adjourn this matter as to his client

16  until next Tuesday.  And that actually also gives me the

17  opportunity to ask Your Honor.  There is a warrant affirmation,

18  two of them in fact, relating to the search of Mr. Lopez's

19  residence, and I would like to be able to give those to counsel

20  so that he can review them and so forth.

21          They were sealed at the time they were issued in the

22  -- by Judge Ho on -- basically because they hadn't been issued

23  yet, but there's no reason to continue to have them sealed.  So

24  for the purpose of Jenks, since the witness will be testifying

25  on the basis of those, I would like the Court's permission to

1　disclose those to counsel.

2　　　　THE COURT:  All right, your oral -- do you have the

3　cause numbers for the warrant?

4　　　　MS. SCHWARTZ:  I do.  It would be -- they're both

5　under the same cause number because one was a followup.  Once

6　they found certain things, it expanded the scope.  The case

7　number is 4:24-MC-6758.

8　　　　THE COURT:  All right.  Your oral motion to unseal

9　the warrants in 4:24-MC-6758 is granted.

10　　　　MS. SCHWARTZ:  For the purpose of Jenks in this

11　matter, Your Honor, I don't want them unsealed for all purposes

12　--

13　　　　THE COURT:  All right --

14　　　　MS. SCHWARTZ:  -- at this point.

15　　　　THE COURT:  Unsealed for purposes of Jenks to give to

16　counsel for the defendant, and that otherwise they remain

17　sealed.

18　　　　MS. SCHWARTZ:  Thank you.  I will email them to him.

19　　　　THE COURT:  Okay.  All right.  So -- is next Tuesday,

20　September 10th?

21　　　　CLERK:  Yes, Judge.

22　　　　THE COURT:  All right.  We will -- what time did I

23　set that other hearing?

24　　　　CLERK:  Ten o'clock.

25　　　　THE COURT:  Let's set this for 10:30.  You may have

1    to wait a little bit, but 10:30 on Tuesday, September 10th.

2              MR. ALMAGUER:  Next Tuesday, 10:30?

3              THE COURT:  Yes.

4              MR. ALMAGUER:  Yes, Your Honor.

5              THE COURT:  I'll have -- I have a hearing before you

6    at ten, but hopefully we'll be finished by 10:30.

7              All right.  So, Mr. Lopez, you understand that your

8    attorney has asked for a continuance.  You're entitled to have

9    your potential within three days.  Usually the defense can ask

10   for continuance of five days.  Your attorney has asked for a

11   longer continuance in order to review a lengthy amount of

12   information.  Do you understand that means you're going to be

13   held in custody at least until September 10th?

14             MR. LOPEZ:  Yes, ma'am.

15             THE COURT:  All right.  All right, you're excused.

16             MR. LOPEZ:  Thank you.

17             THE COURT:  All right.  With respect to -- yes, Mr.

18   Vinas.

19             MR. VINAS:  Thank you, Judge.  In light of that, may

20   I have a moment to discuss with Mr. Madrigal what just

21   happened?  Because we may want to do the same.

22             THE COURT:  Why doesn't everybody speak with their

23   clients about whether or not they want to go forward on Tuesday

24   the 10th?  I was going to do it -- who's on duty?

25             MR. ESSMYER:  If I may, Your Honor, Mr. Robledo

1   prefers to go forward today.

2        THE COURT:  Okay.  We'll figure out in terms of

3   marshal coverage who -- whether Judge Bennett hears it or I

4   hear it, but I'll give you the opportunity to talk to your

5   client, Mr. Essmyer and Mr. Robledo.  You can have a seat at

6   council table if you want to go forward today.

7        MR. ESSMYER:  Yes, Your Honor.

8        THE COURT:  Okay.  And I'll give you a few minutes.

9   Yes.

10       (Counsel and client conferring)

11       MR. ESSMYER:  May I have a moment to confer with U.S.

12  government, Your Honor?

13       THE COURT:  Yes.

14       (Counsels conferring)

15       THE COURT:  Some attorneys are speaking with their

16  clients.  Mr. Lopez has already requested a continuance, which

17  I've granted.  Mr. Essmyer says his client wants to go forward

18  today --

19       MR. TRAN:  I understand.  I understand.

20       THE COURT:  And he's entitled to a hearing within

21  three days if he doesn't want a continuance.

22       MR. TRAN:  Sorry.  I thought the whole case was going

23  but understood.  Just --

24       THE COURT:  No problem.

25       MR. TRAN:  -- specifically.

1          (Counsels conferring)

2          THE COURT:  Mr. Vinas, are you going to be going

3   forward today?

4          MR. VINAS:  We would like to join Mr. Lopez's --

5          THE COURT:  Okay.

6          MR. VINAS:  -- continuance, if we could, Judge.

7          THE COURT:  All right.

8          MR. VINAS:  On behalf of Mr. Madrigal.  We discussed

9   that here in the courtroom.

10          THE COURT:  All right.  And Ms. Sparks?

11          MS. SPARKS:  Your Honor, on behalf of Mr. Tingle, we

12   will move forward.  I have spoken with the government and they

13   only intend to present a limited amount of information.

14          THE COURT:  Okay.  So, he's going forward today.

15          MS. SPARKS:  That's correct.

16          THE COURT:  And Mr. Madrigal is asking for

17   continuance until September 10th at 10:30 a.m.  Not --

18   September 10th at 10:30 a.m.

19          MR. VINAS:  Yes, Your Honor.

20          THE COURT:  All right, the continuance is granted.

21          MR. VINAS:  Thank you, Judge.  May I be excused?

22          THE COURT:  You may.

23          MR. VINAS:  Thank you, Judge.  Mr. Madrigal, you

24   understand that your -- you understand that your hearing is

25   continued until September 10th, which is next Tuesday?

1    MR. MADRIGAL:  (indiscernible).

2    THE COURT:  To your attorney?

3    MR. VINAS:  Yes.  I'll stick around.

4    THE COURT:  Okay.

5    MR. VINAS:  Thank you, Judge.

6    THE COURT:  Thank you.  All right.  We're ready to go

7    forward with Mr. Tingle and Mr. Robledo, correct?

8    MS. SPARKS:  Yes, Your Honor.

9    MR. TRAN:  Your Honor, could we do Mr. Robledo first,

10   just (indiscernible) witness?

11   THE COURT:  All right.  We'll -- Mr. Robledo will be

12   first, all right, Mr. Essmyer?

13   MR. ESSMYER:  Yes, Your Honor.

14   THE COURT:  All right.  You may call your first

15   witness.

16   MR. TRAN:  The government calls Mr. -- special agent

17   Kevin Hunt, Your Honor.

18   CLERK:  Do you solemnly swear the testimony

19   (indiscernible) the Court will be the truth, the whole truth,

20   and nothing but the truth, so help you God?

21   THE WITNESS:  Yes, ma'am.  I do.

22   CLERK:  Thank you.

23                  DIRECT EXAMINATION OF KEVIN HUNT

24   BY MR. TRAN:

25   Q    Special Agent Hunt, just so we have a complete record, can

1    you tell us where you're employed again?

2    A    Texas Department of Public Safety.

3    Q    And how long have you employed TPS?

4    A    A little over 27 years.

5    Q    How did you first become aware of the defendant Jared

6    Robledo?

7    A    I got a call from a special agent out of the Houston area

8    in regards to Mr. Robledo going down and picking up large

9    quantities of cocaine.

10   Q    And where was he returning to?

11   A    Walker County.  Huntsville.

12   Q    And were you involved in the incident involving Mr.

13   Robledo on April 30th, 2024?

14   A    Yes, I was.

15   Q    Can you tell the Court what happened?

16   A    Yes.  We got word that Mr. Robledo was going down to the

17   Harris County area to pick up a kilogram of cocaine.  We have

18   ways and we surveilled his vehicle down there and then

19   surveilled it back.  We got him coming into Walker County just

20   south of New Waverly.  Coming into New Waverly, he saw the

21   marked unit, dodged off in New Waverly onto 1375 going towards

22   downtown New Waverly.

23        Pulled into a car wash like a handheld car wash, not an

24   automatic car wash type deal, for a brief moment.  I radioed to

25   the trooper to get away, hide, disappear.  That way, he'll come

1    back out onto the roadway.  That ended up happening.  The

2    trooper got back onto the roadway.    Mr. Robledo had to have

3    seen him again and then pulled into a gas station on the corner

4    of 75 and 1375.  It was a Shell gas station.

5        He pulled up to the air pump.  I was sitting at the gas

6    pump watching the entire time.  He gets out, kicks his tires

7    acting like his a flat tire or something, and never put air in

8    the tire or anything like that.  I radioed to the black and

9    white, just leave the area.  The black and white and departed,

10   left the whole area.  We had other marked units scattered out

11   and several unmarked units that maintained visual on Mr.

12   Robledo the entire time.

13       A brief time later, Mr. Robledo exits the shell gas

14   station, goes to the stop sign, turns left and heads north on

15   75 headed towards Huntsville.  Our unmarked units surveil him

16   the entire way.  Right before he gets to 2296, which is a

17   farmer market road that cuts from 75 over to 190, Mr. Robledo

18   meets a marked county unit.

19       Mr. Robledo turns onto 2296 heading kind of a northeast

20   direction.  There's one vehicle in between me and Mr. Robledo.

21   The marked unit gets in behind us.  I let the marked unit get

22   around me.  We go that whole way.  It's raining.  Two lane

23   road.  Not a lot of passing areas or anything like that.

24       We get up to the intersection of 190 and the traffic stop

25   was fixing to take place.  There was lengthy traffic on 190.

1    It's two-lane road.  Lots of traffic coming.  Mr. Robledo sees

2    a little gap.  He goes.  The truck behind him does not go.  The

3    marked unit can't get around.  Marked unit ends up activating

4    his emergency equipment.  Gets around eventually once there's a

5    break in traffic and attempts to go stop Mr. Robledo.  That

6    time, we lost visual of Mr. Robledo.

7         Short time later, we end up getting a visual on him.  He's

8    back out on 190 headed towards Dodge.  Gets out to Dodge.  We

9    call in the marked units.  The unmarked units are following

10   him.  He turns northbound on 405 and that's where the traffic

11   stop takes place.  A marked -- a county unit ends up traffic

12   stopping Mr. Robledo.

13   Q    And during this traffic stop, did -- was any narcotics

14   found on him?

15   A    No.

16   Q    And based on your kind of professional experience, was it

17   very obvious that Mr. Robledo was evading arrest?

18   A    Yes, it was.

19   Q    Okay.  And he was successful in doing so for a while; is

20   that correct?

21   A    That is correct.

22   Q    And did -- were there were K9s, narcotics K9s brought to

23   the car?

24   A    Correct.

25   Q    And they alerted on the car?

1    A    That is correct.

2    Q    But no narcotics were found, right?

3    A    No, sir.

4    Q    Okay.  Did you talk to investigating agents later about a

5    wire intercepted call between Jared Robledo and Jose Lopez?

6    A    Yes, I did.

7              MR. TRAN:  Your Honor, just briefly, I can either

8    play the recording -- it's about seven minutes -- or I can have

9    the agent testify to it.  Which --

10             THE COURT:  Mr. Essmyer, are you fine with having the

11   agent testify rather than playing the entire seven-minute

12   recording?

13             MR. ESSMYER:  Yes, Your Honor, because I have not

14   waived the ten-day rule to begin with.

15             THE COURT:  Well --

16             MR. ESSMYER:  That was waived by Mr. Fickman for his

17   client.

18             THE COURT:  I've actually never had this come up at a

19   detention hearing, so what are you telling me?  You're not

20   going to waive the ten -- you're not going to waive the ten

21   days' notice, but you are fine with the agent testifying?

22             MR. ESSMYER:  Well, he has a right to testify about

23   it, Your Honor.

24             THE COURT:  Okay.  All right.

25             MR. TRAN:  All right, Your Honor.  We'll go with the

1    agent testimony then.

2    BY MR. TRAN:

3    Q    Who are the two people on the wiretapped call?

4    A    Mr. Robledo and Mr. Lopez?

5              MR. ESSMYER:  Excuse me, Your Honor.  May I ask him

6    how he knows it's Mr. Robledo?

7              THE COURT:  Briefly, yes.

8                   VOIR DIRE EXAMINATION OF KEVIN HUNT

9    BY MR. ESSMYER:

10   Q    How do you know who --

11   A    I've known your client for quite some time as well as I

12   recognize his voice because I've talked to him before.

13             MR. ESSMYER:  Thank you.

14   BY MR. TRAN:

15   Q    And did you also talk to investigating agents in the

16   larger investigation that confirmed the voices on the --

17   A    Yes, that is correct as well.

18   Q    Okay.  And what did Mr. Robledo tell Mr. Lopez on this

19   call?

20   A    Mr. Robledo is talking about how he had a close call and

21   everything and he recognized that there was police around and

22   it was his quick thinking and his smart thinking that he ducked

23   in and made it look like he had -- he was having tire trouble

24   and stuff like that, and then that he was able to get away from

25   him because he caught a little break in the cars and he ducked

1    into his brother's house -- I believe it was his brother's

2    house -- and he got rid of the issue.  And then when he got

3    back on the road and he got traffic stopped, he didn't have

4    anything to worry about because he didn't have anything on him.

5    Q    Okay.  And he specifically said he got rid of the small

6    issue at his brother's house; is that correct?

7    A    That is correct. And

8    Q    Okay, and based on your training and experience, what does

9    the small issue refer to?

10   A    That would be the narcotics.

11   Q    Okay.  And then does he later say that because of his

12   quick thinking he was "clean" when --

13   A    Yes.

14   Q    -- was pulled over?

15   A    That is correct.

16   Q    What does clean mean?

17   A    That means that he didn't have any kind of contraband on

18   him.

19   Q    Okay.  And would that explain why the narcotics dog would

20   alert on the car but then you guys didn't find anything?

21   A    Yes, sir.

22   Q    Okay.  And what is the basic -- what would you say was the

23   purpose of Robledo calling Lopez to tell him about this

24   incident?

25   A    I would say, one, he's bragging that he's eluding law

1    enforcement and that he's good at what he does and building

2    kind of, like, building confidence with Mr. Lopez.

3              MR. ESSMYER:  I object, Your Honor.  While hearsay

4    may be allowed, speculation is still prohibited.

5              THE COURT:  All right, sustained.

6    BY MR. TRAN:

7    Q    And did -- just generally speaking, did Mr. Lopez in this

8    seven-minute recall match basically turn for turn what you

9    described happened in the chase?

10   A    Yes.

11   Q    And the only missing evidence was when you lost sight of

12   him, he tells us what he did, right?

13   A    That is correct.

14   Q    Did you get a chance to review the defendant's criminal

15   history?

16   A    Yes.

17   Q    Is he currently on Court supervision?

18   A    He is.  He's on a ten-year deferred out of Walker County.

19   Q    And what was that offense for?

20   A    Manufacture and delivery.

21             MR. TRAN:  Okay.  No further questions at this time,

22   Your Honor.

23             MR. ESSMYER:  May I proceed, Your Honor?

24             THE COURT:  Yes, one moment.  And this was a motion

25   under 3142(f)(1) and it's a presumption case here?  That's your

1  basis for your motion to detain?

2          MR. TRAN:  Yes, Your Honor, 3142(e)(3)(A).

3          THE COURT:  And you agree it's a presumption case,

4  Mr. Essmyer?

5          MR. ESSMYER:  Yes, Your Honor.

6          THE COURT:  All right.  You may proceed.

7  BY MR. ESSMYER:

8  Q    Sir, you never found any drugs, did you?

9  A    That is correct.

10 Q    You don't have a weight of drugs that were being

11 transported, do you?

12 A    I do not.

13 Q    You don't know the type of drugs that were being

14 transported, do you?

15 A    I know the type of drugs that were being talked about.

16 Q    You don't know -- specifically, you can't tell us what the

17 type was because you didn't find any, did you, sir?

18 A    The type of -- the type of drugs negotiated that Mr.

19 Robledo was going down to Harris County to pick up was cocaine.

20 Q    You --

21 A    Do I know what he picked up?  No.  I just know that's what

22 was talked about.

23 Q    It wasn't talked about by Mr. Robledo, though, was it?

24 A    It was talked about, Mr. Robledo.

25 Q    By who?

1  A    By who?

2  Q    By whom?

3  A    Between him and Mr. Lopez.

4  Q    And you have a tape of that?

5  A    I do not have a tape of it.

6  Q    So, you're saying you don't have a tape of it that you're

7  so sure that it exists.

8  A    I am very sure that it exists.

9  Q    Why?

10  A    Because that was portrayed to me from the agents in

11  Houston.

12  Q    So, as we sit here today, you don't have any proof of it,

13  do you?

14  A    I do not as we sit here today.

15  Q    What did you review in preparation for your testimony as

16  to Mr. Robledo for today?

17  A    Since last week up until today.

18  Q    What did you review?

19  A    What did I review?

20  Q    Yes, sir.

21  A    The report that I created, his criminal history.

22        THE COURT:  Mr. Essmyer, can I ask you to pull that

23  microphone closer to you so we can get your questions on the

24  record?  Thank you.

25  BY MR. ESSMYER:

1  Q    Do you have a copy of that with you today?

2  A    I do not have a copy of anything with me today.  No, sir.

3         MR. TRAN:  They were the ones I emailed to you.  I

4  emailed you everything he reviewed.

5         THE COURT:  I didn't hear you, Mr. Tran.

6         MR. TRAN:  I was telling defense counsel that I

7  provided to defense --

8         MR. ESSMYER:  Thank you.

9         MR. TRAN:  -- everything that the agent reviewed.

10  (indiscernible).

11         THE COURT:  Okay, so Mr. Essmyer, you've been given a

12  copy of everything the agent reviewed according to Mr. Tran.

13         MR. ESSMYER:  I'll proceed, Your Honor.

14         THE COURT:  Thank you.

15  BY MR. ESSMYER:

16  Q    At the time of the traffic stop, there were no weapons and

17  there was no fight or anything else, was there?

18  A    That is correct.

19  Q    It was a typical traffic stop?

20  A    Yes, sir.

21  Q    Except you had dogs and a bunch of cars.

22  A    Well, the dogs came later, but yes.

23  Q    How much later did they come?

24  A    That part, I wouldn't have -- I wouldn't have it

25  documented.  I would say 10 to 15 minutes maybe at the most.

1  Q    All right.  But nobody was in fear of their life, were

2  they?

3  A    Not that I know of.  They didn't relay that on the radio.

4  Q    No guns, no drugs, no fisticuffs.  Right?

5  A    Correct.

6  Q    At the time of the arrest, there were no guns, no drugs,

7  no fisticuffs.  Right?

8  A    That is correct.

9  Q    It was a clean, here we are -- you arrested him at his

10  mother's house, right?

11  A    We arrested him at the house where we had been watching

12  him for months.

13  Q    26 South Walnut Drive?

14  A    That is correct.

15  Q    Huntsville, Texas?

16  A    That is correct.

17  Q    He's a longtime Huntsville resident, isn't he?

18  A    He is indeed.

19  Q    Born and raised there, wasn't he?

20  A    He is.

21  Q    Never been away from there, has he?

22  A    Not to my knowledge.

23  Q    You say you've known him for a long time; is that true?

24  A    I've known of him for quite some time.  Yes, sir.

25  Q    And he's not known as a troublemaker, is he?

```
 1   A    I would say that he is one of the largest scale narcotics
 2   suppliers in Walker County.
 3   Q    Excuse me, sir.  That wasn't my question.
 4   A    To me, that is a troublemaker.
 5   Q    He's --
 6   A    That's not doing well to society.
 7   Q    He's not known for being a danger to himself or others, is
 8   he?
 9   A    I have not seen him be a danger.  I know he's been shot
10   before, but I don't know other than that.
11   Q    All right.  You don't think he mentally is a danger to
12   himself, do you?
13   A    That part, I don't know.  I've not dug in that deep to
14   him.
15   Q    You said you've known him forever.
16   A    I don't know his mental stability.
17   Q    Well, you haven't seen me be unstable, have you?
18   A    I haven't.
19   Q    You know that he's got a large family?
20   A    I know that he has a large family.
21   Q    And you -- do you recognize his mother here today?
22   A    Hm?
23   Q    Do you recognize his mother being here today?
24   A    I do know she is here, yes.
25   Q    Do you recognize his 20-year-old son?
```

1  A     I do.

2  Q     Do you recognize any -- his girlfriend back there?

3  A     No.

4  Q     Do you -- you're aware that he has a six-year-old child?

5  A     Correct.

6  Q     All right.  So, we don't know if the amount of drugs he

7  was carrying, if he was carrying any, was for personal

8  consumption or for sale, do we?

9  A     The quantity that he was supposed to pick up was not --

10  would not have been for personal consumption.

11  Q     And that's a big speculation, isn't it?

12  A     No, sir.  I've not seen one person buy a kilogram of

13  cocaine for personal consumption.

14  Q     You didn't see this guy buy a kilo --

15         THE COURT:  Mr. Essmyer, you covered this ground.

16  Let -- we've got another hearing after you and then the two

17  o'clock docket.

18  BY MR. ESSMYER:

19  Q     You're aware that he has had previous court appearances?

20  A     He's had several, yes.

21  Q     In state court and he's made his appearances, did he not?

22  A     To my knowledge.

23  Q     You don't believe he's a flight risk, do you?

24  A     I -- that's not my -- I'm not here to testify on that.  I

25  do believe that if given a chance and the severity of what he's

1  facing, do I think that he would flee?  I think there's a good

2  chance.

3  Q    But again, you're speculating, aren't you?

4  A    That is my opinion.

5  Q    Do you know any place besides Huntsville that he has

6  relatives or neighbors or friends?

7  A    I had heard that his dad's in Mexico, but that part, I do

8  not know.  I also know that he's not been arrested outside of

9  Walker County in regards to facing severity of federal charges,

10  which federal charges are quite severe versus state charges.

11  Q    There are conditions such as ankle bracelets that can be

12  used, are there not?

13  A    There are.

14  Q    If he were on a pretrial release, you wouldn't fear going

15  to pick him up for some reason, would you?

16  A    I picked him up when he was wanted.  So, that's part of my

17  job description.

18            MR. ESSMYER:  Pass the witness, Your Honor.

19            THE COURT:  Thank you, Mr. Essmyer.  Any redirect,

20  Mr. Tran?

21            MR. TRAN:  Nothing further, Your Honor.

22            THE COURT:  All right.  You may step down --

23            THE WITNESS:  Thank you.

24            THE COURT:  --- Agent Hunt.  Do you have any other

25  witnesses, Mr. Tran?

1        MR. TRAN:  No, Your Honor.

2        THE COURT:  Do you have any witnesses, Mr. Essmyer?

3        MR. ESSMYER:  I have proffer, Your Honor.

4        THE COURT:  Okay.

5        MR. ESSMYER:  (indiscernible) Robledo.  That's the

6    mother of Mr. Robledo and she would -- I would proffer that she

7    is the mother.  She loves him dearly.  That she would allow him

8    to continue to stay at her home at 26 South Walnut Drive,

9    Huntsville, Texas 77330?  320.  And that she has gone by his

10   places of employment -- and I have tendered this to the

11   government before -- and she received letters saying that they

12   would continue to allow him to work.  That's the Daisy --

13   Daisy's Diner in Riverside in Huntsville, Riverside Drive, and

14   Blessed Ink or Sacred Stag.  And I tender those as exhibits.  I

15   don't have copies.  I've already sent them to the government.

16       THE COURT:  All right.  You can hand them to Ms.

17   Morgan.

18       MR. ESSMYER:  So, be my Exhibit 1 and 2.

19       THE COURT:  All right, thank you.  Any objection, Mr.

20   Tran, to these being admitted?

21       MR. TRAN:  No, Your Honor.

22       (Defendant's Exhibits 1 and 2 entered into evidence)

23       THE COURT:  And for the record, I take judicial

24   notice of the pretrial services report.

25       MR. ESSMYER:  She would testify that she would cosign

1    that he has a place to live, that she believes that he is not a

2    danger to himself or others, that he wouldn't flee.  And she's

3    willing to go cosign for that very purpose.  She would help try

4    to maintain the pretrial release conditions and otherwise she

5    would be as helpful as she could to the Court in maintaining

6    those conditions.

7              THE COURT:  Was he living with her from the time he

8    was put on probation?

9              MR. ESSMYER:  He was and I've talked to the state

10   attorney, James -- Jim Hurst who says that until this event

11   that he was unaware of any violation of that supervised

12   release, and there wouldn't have been anything that she would

13   have known, either.  They're unaware -- he's unaware of any

14   motion to revoke.  Any rate, Jacob Robledo.  You're the

15   brother.  He would testify that he lives in Conroe, but he

16   would testify that he would -- he believes that my client is

17   not a danger to himself or others, that he would help maintain

18   the pretrial release conditions.  Jeremy (indiscernible) -- how

19   do you pronounce your name?

20             MAN:  (indiscernible).

21             MR. ESSMYER:  He's a lifelong friend and he says the

22   same thing.  He does not believe that he's a danger to himself

23   or others, and that he would fulfill the terms and conditions

24   of pretrial release.  Cesar.  You're the 20-year-old son,

25   right?

1        MAN:  I'm 19.

2        MR. ESSMYER:  Nineteen.  I got it wrong.  I'm sorry.

3  He would -- again, believes that he's not a danger to himself

4  or others and that he would fulfill -- he would help fulfill

5  the conditions of pretrial release in this case.  He loves his

6  dad very much.  Stacy.  How do you pronounce your last name?

7        MS. PEREZ:  Perez.

8        MR. ESSMYER:  That's not a hard one.  I'm sorry.  She

9  has -- she is the mother of the six-year-old child of my client

10  and she, again, loves him very much.  Would help him fulfill

11  the conditions of pretrial release and definitely believes he's

12  not a danger to himself or others.  With that, I rest, Your

13  Honor.

14        THE COURT:  Thank you, Mr. Essmyer.  All right.  I'm

15  ready for argument.

16        MR. TRAN:  Thank you, Your Honor.  As you noted, this

17  is again, a presumption case under 3142(e)(3)(A) and the

18  defendant hasn't overcome the presumption of a flight risk or

19  of danger to the community.  Starting with the flight risk,

20  again, the weight of the evidence is significant and he faces

21  significant time if convicted.  Here, if we charge the

22  enhancement, he's looking at a mandatory minimum of ten years

23  in federal custody and the weight of the evidence is

24  overwhelming.

25        We have him on the wire bragging to a supplier that

1    he was smart enough to evade police arrest and it's turn by

2    turn, fills in the only gap that was missing from the police

3    report of what happened after they lost sight of him and he

4    brags on the wire that he was smart enough to go to his

5    brother's place to ditch the issue for a day or two.

6           So, I think the weight of the evidence and the nature

7    of the charged offense really does go to the fact that he's

8    facing significant time, that he has incentive to flee.  He

9    hasn't done anywhere near as much as what he's facing now,

10   including the ten years deferred adjudication on the state

11   charge.  He's a flight risk because he's mobile.  He travels

12   across county lines to continue to traffic narcotics.

13          He has a history of evading police and, you know --

14   but for the wiretapped call, he's good at it.  We wouldn't have

15   known what he did when he was able to evade the police, but

16   fortunately for law enforcement, he wanted to brag about it.

17          In 2020, he was charged with fleeing a police

18   officer.  So again, this is a pattern of evading police and he

19   has a father in Mexico.  I know he has family here, but he has

20   a father in Mexico and again, he doesn't have -- this is the

21   largest sentence he's ever faced, and he's traveled to Mexico

22   as recent as 2020.  So, the government believes that that is a

23   place where he might flee to evade prosecution.

24          And I think finally that the -- kind of the danger to

25   the community is something that he cannot overcome because he

1    was under Court supervision for manufacturing and delivering a

2    controlled substance.  He resided with his mom and he continued

3    to do the same thing that he got caught for this time, so it

4    doesn't -- there are no conditions that the Court can impose

5    that would guarantee that he won't continue drug trafficking.

6            And the idea that he's not harming himself, drug

7    trafficking is a harm to the community.  It's a danger to the

8    community.  So, I don't -- I don't believe that the defense has

9    presented any evidence that there can be any conditions of

10   release where he wouldn't be a danger to the community.

11           THE COURT:  Thank you, Mr. Tran.  Mr. Essmyer.

12           MR. ESSMYER:  No drugs were found.  I'm not sure it

13   is a case where there's presumption, when you can't find any

14   drugs.  And I don't believe that the testimony --

15           THE COURT:  He's charged with a crime that carries a

16   presumption.

17           MR. ESSMYER:  I understand.

18           THE COURT:  At this hearing.

19           MR. ESSMYER:  I agreed to it at the start, but I'm

20   just pointing out that --

21           THE COURT:  Okay.

22           MR. ESSMYER:  -- even if he had drugs, it could have

23   been for personal use.  They don't have the evidence they need.

24   But let's go on from there.  There are methods and procedures,

25   conditions that the Court can set.  He's not going to run with

1  his mother as a cosigner.  He loves his mother very much.

2  There are conditions rather than detention that will fit this

3  case significantly and I urge the Court that the presumption

4  has been broken, that he should be allowed pretrial release.

5  And that's all I have, Your Honor.

6  THE COURT:  Thank you, Mr. Essmyer.  All right.

7  These are my findings.  I -- the charges that you face Mr.

8  Robledo, they carry a presumption that you pose a danger to the

9  community and a risk of nonappearance.  In order -- you have to

10  submit evidence or present some evidence to show that the

11  presumption has been overcome.

12  Even if you present evidence showing the presumption

13  has been overcome, that presumption does not go away.  It is

14  still something I have to consider when deciding whether or not

15  there are conditions of release that can reasonably protect the

16  safety of the community and your appearance in Court.  In this

17  case, I do not find that the presumption that you pose a danger

18  to the community has been met.

19  I do believe that the proffer from your counsel

20  overcomes the presumption of risk of flight because he

21  established that you have strong family support here in the

22  courtroom and many people willing to support you.  I think that

23  is sufficient to rebut the presumption of risk of flight.

24  However, even if I found that the presumption of danger to the

25  community had been met, I find that there are no conditions of

1  release that I can reasonably expect to protect the community,

2  and the basis for that in large part is the fact that you were

3  on probation already for a prior offense, a prior manufacture

4  or delivery of controlled substance offense, when you were

5  arrested in this case.

6  So, the fact that you were not complying with your

7  conditions of probation just show me that there aren't any

8  conditions that I can impose that would reasonably protect the

9  safety of the community.

10  In addition, I've heard testimony that you're one of

11  the largest narcotic traffickers in Walker County.  There are

12  many, many factors, but my first finding is presumption of

13  danger has not been overcome.  Second finding, even if that

14  presumption had been overcome,  find that there are no

15  conditions that I can impose that I can expect Mr. Robledo to

16  follow, in part based on the fact that he was on probation for

17  the same type of offense when he committed the conduct that's

18  charged in the indictment that we're here on today.

19  So, I will remand him to the custody of the U.S.

20  Marshals.  I'll issue a written order later in the week.  Mr.

21  Robledo is excused.

22  MR. TRAN:  Thank you, Your Honor.

23  MR. ESSMYER:  May we be excused, Your Honor?

24  THE COURT:  You may be excused, Mr. Essmyer.  Thank

25  you.

1    MR. TRAN:  May I be excused, Your Honor?

2    THE COURT:  Yes.

3    MR. TRAN:  Okay.  (indiscernible).

4    THE COURT:  All right.  Mr. Tingle.  Let me have

5    appearances for this portion of the hearing.

6    MR. MEGGALI:  Good afternoon, Your Honor.  George

7    Meggali for the United States, M-E-G-G-A-L-I.

8    THE COURT:  M-E-G-G?

9    MR. MEGGALI:  A-L-I.

10    THE COURT:  Thank you.

11    MS. SPARKS:  And good afternoon, Your Honor.  Monique

12    Sparks for Mr. Alan Tingle.

13    THE COURT:  Thank you, Ms. Sparks.  Mr. Tingle is

14    present at counsel table.  All right.  Again, the charges

15    against Mr. Tingle are presumption -- carry presumption.

16    MR. MEGGALI:  Yes, Your Honor.  The government

17    asserts that they carry presumption under 18 USC 3142(e)(3)(A),

18    looking at counts one and two in particular.

19    THE COURT:  Okay.  And you agree, Ms. Sparks, that

20    this is a presumption case?

21    MS. SPARKS:  Yes, Your Honor.

22    THE COURT:  All right.  You may proceed, Mr. Meggali.

23    MR. MEGGALI:  Your Honor, the government calls

24    Detective Shane Krantz.

25    CLERK:  (indiscernible).  Do you solemnly swear that

1    the testimony you will give in this case now before the Court

2    will be the truth, the whole truth, and nothing but the truth,

3    so help you God?

4              THE WITNESS:  Yes, ma'am.

5              MR. MEGGALI:  May I proceed, Your Honor?

6              THE COURT:  You may.

7                   DIRECT EXAMINATION OF SHANE KRANTZ

8    BY MR. MEGGALI:

9    Q    Good afternoon. Please state and spell your name for the

10   record.

11   A    It's Shane Krantz, S-H-A-N-E, K-R-A-N-T-Z.

12   Q    Where are you employed?

13   A    The Houston Police Department as a --

14   Q    What is your position --

15   A    -- detective.

16   Q    I'm sorry.  What is your position at HPD?

17   A    Detective.

18   Q    And how long have you been with HPD?

19   A    Twelve years.

20   Q    And have you become familiar with a criminal matter

21   involving Alan Tingle?

22   A    Yes, sir.  I have.

23   Q    Are you a case agent on this case?

24   A    No, sir, I'm not.

25   Q    But have you spoke with case agents and reviewed relevant

1 documents involving his federal criminal matter?

2 A    Yes, sir, I have.

3 Q    And do those documents include portions of a search

4 warrant to his home?

5 A    Yes, they do.

6 Q    And did it also include his criminal history and a report

7 of his interview with law enforcement?

8 A    Yes, I did.

9 Q    Is he also known as AJ?

10 A    Yes, sir.  That is a nickname.

11 Q    And have you become familiar with the defendant after

12 reviewing his photo on DMV records?

13 A    Yes, sir.  I have.

14 Q    Do you see the defendant in the courtroom here today?

15 A    Yes, sir.  He's sitting at the table right in front of me

16 in the green shirt.

17        MR. MEGGALI:  Your Honor, may the record reflect that

18 witness identified the defendant by the clothing and location?

19        THE COURT:  Yes.

20 BY MR. MEGGALI:

21 Q    Now, Detective Krantz, as part of your preparation for

22 this hearing here today, did you learn that law enforcement

23 conducted a search of the defendant's home on May 22nd, 2024?

24 A    Yes, sir, I did.

25 Q    And where is this house located?

1   A    8707 Olive Ranch Court.

2   Q    In Houston?

3   A    Yes, sir, in Harris County.

4   Q    And as part of your preparation did you learn that he was

5   part of drug trafficking operations?

6   A    Yes, sir, I did.

7   Q    And did law enforcement make any observations consistent

8   with suspicions that he's trafficking drugs?

9   A    Yes, sir.  I was informed of three instances that they

10  documented in their affidavit.  One was on April 10th, 2024

11  where defendant Tingle walked out to a vehicle driven by Jose

12  Lopez.  He walked out with a box that was given to Mr. Lopez

13  through the passenger window.  Officers had surveillance on

14  this house and then they followed defendant Lopez to another

15  location where he pulled up next to another vehicle in a cul-

16  de-sac, door to door, and a packet, that same cardboard box was

17  exchanged to this other unknown person.  And then that person

18  gave Lopez a wrapped-up bag full of something and then they

19  departed.

20       The second instance happened on April 26th where, I

21  believe -- yeah, it was April 26th.  Defendant Tingle walked

22  out to the vehicle, gave another package to defendant Lopez,

23  and walked back into the house carrying a weighted down red

24  back.

25       The third incident happened on May 16th and that's where

1   the girlfriend of defendant Lopez arrived at 8707 Olive Branch

2   Court with Lopez's daughter.  She went to the trunk and got a

3   plastic bag containing something wrapped up, put it in her

4   purse and went inside the residence.

5   Q    And do you know the name of Lopez's girlfriend?

6   A    Kelsey Rigby.

7   Q    And how did he learn that she was his girlfriend at the

8   time?

9   A    From one of the case agents on this case.

10  Q    And were any of these encounters captured on pole camera?

11  A    Yes, sir.  Every incident at the house at 8707 Olive

12  Branch Court was captured on pole camera as well as the vehicle

13  driven by Lopez also had a vehicle tracker on it that they

14  tracked the movements with that as well.

15  Q    Now, with respect to the May 22nd search of the

16  defendant's home, did you speak with any law enforcement agents

17  who were there when the warrant was executed?

18  A    Yes, I did.

19  Q    And did you also review the inventory report out of that

20  search?

21  A    Yes.  Yes, sir, I did.

22  Q    What was found from the search?

23  A    There was approximately $4,600 in cash that was found, a

24  large amount of cocaine, 630 grams approximately, multiple

25  firearms, an AR-15 style rifle, and two pistols were found.

1    And then one of the case agents explained to me that the

2    kitchen there was a kind of a makeshift, like, drug lab set up.

3    So, there was like beakers, precursor chemicals to create crack

4    cocaine as well as baggies consistent with, you know, packaging

5    those up and selling them.

6    Q    Would you be able to put a total number on the number of

7    firearms recovered?

8    A    Three firearms.

9    Q    And do you know whether the suspected cocaine was

10   ultimately confirmed to be cocaine?

11   A    Yes, sir, it was.  I saw the -- I was provided a lab

12   analysis that confirmed that.

13   Q    Was it a DEA lab analysis?

14   A    I believe so.  Yes, sir.

15   Q    Now, do you know whether on the day of the search, whether

16   the defendant consented to an interview with law enforcement?

17   A    He did, after narcotics were found in the residence.  He

18   did speak to law enforcement.  He told one of the case agents

19   that the cocaine found in the house, he purchased from Lopez

20   and that Ms. Rigby who brought it there brought it to him

21   because Lopez was out of town.

22   Q    And is that the same Lopez who was seen to have

23   encountered the defendant on April 10th and April 26th?

24   A    Yes, sir, same person.

25   Q    And same Rigby from May 16th?

1    A    Yes, sir.

2    Q    Now, before your testimony here today, have you had a

3    chance to review his NCIC criminal history?

4    A    Yes, sir, I have.

5    Q    And what were you able to gather?

6    A    He has extensive arrest record for narcotics related

7    crimes as well as an escape charge.  He -- one of the

8    convictions I noticed he was convicted in 2007 in May for a

9    drug case and was sentenced to eight years in TDC.  Two years

10   later in May of 2009 he was released on that on parole.

11   However, while he was on parole, which should have lasted until

12   2015, he was arrested again and convicted in January of 2012

13   for another -- for a drug related case, manufacture or delivery

14   of a controlled substance.  So, he committed that crime while

15   he's on parole for another drug related offense.

16              MR. MEGGALI:  No further questions, Your Honor.

17              THE COURT:  Thank you.  Ms. Sparks.

18                   CROSS EXAMINATION OF SHANE KRANTZ

19   BY MS. SPARKS:

20   Q    All right, Detective.  Can you hear me?

21   A    Yes, ma'am.

22   Q    All right.  So, just to be clear, you've never met Mr.

23   Tingle?

24   A    No, ma'am, I have not.

25   Q    Never seen him on surveillance?

1  A    No, ma'am.

2  Q    Don't know if he's a good guy, bad guy?

3  A    Based on his criminal history, I wouldn't say he's a good

4  guy.

5  Q    Okay.  Well, let's talk about it.  You stated you weren't

6  there when they issued the search warrant; is that correct?

7  A    That's correct.

8  Q    But from all of your review, he was cooperative with the

9  police; isn't that right?

10  A    He was cooperative; however, a case agent told me that he

11  -- when they tried to follow up after the search warrant, he

12  did not want to cooperate any further.

13  Q    And let's talk about that.  Is that because he had an

14  attorney, and that would be me, Detective Shane?

15  A    I have -- I do not know that.

16  Q    So, you weren't aware that his attorney called the agent

17  and spoke with him; is that right?

18  A    No, ma'am, I was not aware

19  Q    And you would agree, him getting attorney doesn't mean he

20  doesn't want to be cooperative, right?

21  A    Correct.

22  Q    He has a legal right to representation.

23  A    Correct.

24  Q    And so, let's go back to when he talked to the officers.

25  He wasn't there with an attorney; is that right?

1  A    That's correct.

2  Q    This is before 5K or any of this stuff came up, right?

3  A    Before 5K?

4  Q    Or any kind of deals with the government.  This is just

5  him and the police, right?

6  A    Correct.  I believe he was read his statutory warning

7  during that interaction.

8  Q    And based on his criminal history, he should be aware of

9  whether he can talk or not talk; is that right?

10  A    Correct.

11  Q    But despite those statutory warnings, he was cooperative

12  with the police?

13  A    There that day, yes, he was.

14  Q    And in fact, he told them information that they didn't

15  have; is that correct?

16  A    Well, I like to say that at first he did not cooperate

17  until the drugs were found.  At first he told them that it's

18  already gone, I think referring to the drugs, and then once

19  they did find the cocaine, then he spoke to them.

20  Q    And you're getting that from your review of the report

21  right?

22  A    From -- correct, the interview summary.

23  Q    Not because you were there and saw exactly how the flow of

24  conversation went; is that right?

25  A    Correct.

1  Q    And in fact, he provided information even about the

2  whereabouts of some people; is that correct?

3  A    That, I do not know.

4  Q    And in fact, he didn't -- he was asked not to tell about

5  the search warrant of his house; is that correct?

6  A    I believe that was in the documents, yes.

7  Q    Because if he would have explained that his house would

8  have been searched, all of the other codefendants would have

9  been alarmed; is that right?

10  A    That's possible.  I don't know.

11  Q    And now, this address -- at Olive Branch, is that correct?

12  A    Yes, ma'am.

13  Q    That's the address the search warrant was done at; is that

14  correct?

15  A    Correct.

16  Q    And that was in May of 2024?

17  A    Correct.

18  Q    And he was arrested last week at that same address; is

19  that right?

20  A    That I do not know.

21  Q    Do you have any other information that he was arrested

22  anywhere else?

23  A    No, ma'am, I don't.

24  Q    Do you have any information that when he was arrested that

25  he had any guns, firearms, tried to run, anything like that?

1    A    No, ma'am just on the May 22nd search warrant.

2    Q    And would you be surprised to hear Detective Shane, where

3    they conducted that search warrant in May is the same place he

4    was found last week when they went to go arrest him, right?

5    A    I don't know that, but I'm --

6    Q    And would you agree with me that once the police come in

7    your house and take things, you're kind of on notice that

8    you're under -- we can at least say investigation, right?

9    A    Right.

10    Q    And from all of your research and reading this report, you

11    have no information that he tried to go anywhere in May; is

12    that right, tried to leave the United States, flee?

13    A    During the search warrant?

14    Q    After the search warrant.

15    A    Oh, after the search warrant. No, I don't have any

16    evidence.

17    Q    What about June? Did he try to go anywhere?

18    A    I don't have any evidence of that.

19    Q    July?

20    A    No, ma'am.

21    Q    In August last week when they came, he was in his house in

22    his bed; is that right?

23    A    I'm guessing so, yes.

24    Q    Were you able to read in your reports that he has a

25    passport?

1   A    No, ma'am, I don't have any information regarding that.

2   Q    Would you be surprised to know that he does have a

3 passport that allows him to leave this country, Detective

4 Shane?

5   A    Am I surprised that he has a passport?

6   Q    That he has a passport.

7   A    It's not surprising that somebody has a passport, no.

8   Q    And he had that passport in May, June, July, and August,

9 right?

10   A    Okay.

11   Q    And he didn't go anywhere with it; is that right?

12   A    Not to my knowledge.

13   Q    In these three instances that you talk about, I guess that

14 you read about that you're testifying to, you just see

15 packages.  You don't know what was in it; is that correct?

16   A    That's correct.

17   Q    There's been no lab test, right?

18   A    Of those packages, no.

19   Q    No one was arrested after getting the package; is that

20 correct?

21   A    Not that I'm aware of.

22   Q    So, this is just speculation what was going on during

23 those three particular incidents; is that correct?

24   A    The -- I believe the package that Rigby brought during the

25 third occurrence was the one that he said was from Lopez.

1  Q    Okay.  So, you're saying there was a lab done on the

2  third, that somebody was arrested?

3  A    That was found in the search warrant.  The cocaine that

4  was found in the search warrant.

5  Q    Okay.  So, to be clear, the only drugs ever found on --

6  found in the presence of Mr. Tingle was what was found in the

7  search warrant; is that right?

8  A    That's correct.

9  Q    And now, because you didn't go out to the house, can you

10 tell us where the firearms were found?

11 A    No, I cannot.

12 Q    And in fact, some stuff was found in the attic, right?

13 A    I believe the narcotics were found in the attic.

14 Q    And then some stuff was found locked up in a closet,

15 right?

16 A    That, I don't know.

17 Q    So, you would agree with me if something is in the attic

18 and something is in the closet, they're not kind of operating

19 in connection, right?

20 A    An attic is a common place that would hide contraband.

21 Q    And you would agree, most attics, you've got to do a lot

22 to get to them.  It's not an easy access.  We -- can we agree

23 with that?

24 A    It depends, but --

25 Q    Okay.  And in looking into Mr. Tingle's history, we can

1    see that his criminal history started around 19; is that right?

2    A    I'm not sure his age, but --

3    Q    We can look at the years.

4    A    Yeah.

5    Q    Right?  So, we can agree that 2003 was over 20 years ago,

6    right?

7    A    That's correct.

8    Q    And we can also agree that 2011, was at least over 10

9    years ago, right, 15 years?

10   A    Correct.

11   Q    And that was his last arrest in the criminal justice

12   system, 27, right?

13   A    I believe he had a conviction in 2012.

14   Q    And that was the arrest in 2011.

15   A    Okay.  Yeah.

16   Q    And so, since then we have no other criminal history?

17   A    Not that I'm aware of.

18   Q    And let's talk a bit about, you said he had an escape.

19   Have you read that report?

20   A    No, I didn't read the report.

21         MS. SPARKS:  May I approach, Your Honor?

22         THE COURT:  You may.

23   BY MS. SPARKS:

24   Q    Would you take a minute, Detective Shane, and just --

25   A    Sure.

 1  Q    -- peruse the report (indiscernible).  Just let me know

 2  when you're done with that.

 3           THE COURT:  What is the --

 4           THE WITNESS:  Yeah, I'm --

 5           THE COURT:  What is the report that you're having him

 6  read?

 7           MS. SPARKS:  He's reading the -- Your Honor, the

 8  offense report from the escape charge.

 9           THE WITNESS:  I've scanned it to kind of get myself

10  familiar.

11  BY MS. SPARKS:

12  Q    And just for clarity, so he didn't escape from any

13  premise; is that correct?

14  A    The report says that he was arrested for a drug offense

15  and while at jail pulled away from one of the officers, was

16  able to slip out one of the handcuffs, and ran through the

17  parking lot.  He was detained within the kind of jail complex

18  there, as he was -- climbed over a fence and then detained

19  somewhere within kind of the same complex.

20           MR. MEGGALI:  Your Honor, if I may?  The arrest

21  charge didn't come up on direct examination, so this is beyond

22  the scope of direct.

23           THE COURT:  Well --

24           MS. SPARKS:  Your Honor --

25           THE COURT:  It's in the pretrial services report as

1  part of his criminal history.  She's entitled to go into it,

2  but I'm not sure we're making forward progress, but --

3            MS. SPARKS:  Okay.  Fair enough.

4  BY MS. SPARKS:

5  Q    You can agree with me, Detective Shane, that he wasn't on

6  bond, right?

7  A    It doesn't -- I didn't see that in the report, no.

8  Q    And you're an HPD officer, right/

9  A    Correct.

10  Q    What we would describe that is, is evading on foot; is

11  that right?

12  A    He's -- no, after he's been arrested, and he's in

13  handcuffs, it's considered escape.

14  Q    And going through his criminal history, we don't see any

15  bond forfeitures; is that correct?

16  A    I don't believe I saw any, no.

17  Q    You know, you don't see any bail jumping charges or

18  anything of that nature?

19  A    I don't believe I saw any.

20  Q    Based on his criminal history, it shows that since he was

21  19 up until this day, he goes to court when he's supposed to;

22  is that correct?

23  A    From what I can see, that's what it says.

24  Q    And based on his criminal history, we see drug charges,

25  but we don't see any aggravated crimes; is that correct?

1    A    I did not see any aggravated crimes.

2    Q    No violent crime?

3    A    No, ma'am.

4    Q    No assaultive crime?

5    A    No, ma'am.

6              MS. SPARKS:  Pass the witness.

7              THE COURT:  Any redirect, Mr. Meggali?

8              MR. MEGGALI:  Brief redirect, Your Honor.

9                   REDIRECT EXAMINATION OF SHANE KRANTZ

10   BY MR. MEGGALI:

11   Q    Detective Krantz, on the subject of what was recovered

12   from the house, did you learn who was on site when law

13   enforcement reported to execute the search warrant?

14   A    Yes, ma'am -- sorry.  Yes, sir.  There was a child at the

15   location as well as the defendant's girlfriend.

16   Q    So, was it just the three of them?

17   A    Correct.  There's three of them there during the search

18   warrant on May 22nd.

19              MR. MEGGALI:  No further questions, Your Honor.

20              THE COURT:  All right.  Anything else, Ms. Sparks?

21              MS. SPARKS:  Nothing from this witness, Your Honor.

22              THE COURT:  All right.  You may step down.  Any other

23   witnesses, Mr. Meggali?

24              MR. MEGGALI:  No, Your Honor.

25              THE COURT:  All right.  Ms. Sparks, do you have any

1  witnesses?

2  MS. SPARKS: Yes, Your Honor. We'll be offering our

3  witnesses through proffer. A first -- our first witness via

4  proffer, Miss -- will be Ms. Twee Wing Long and she's here in

5  the courtroom. If you could please stand, Ms. Long. Or your

6  mother. Your Honor, the defense expects that if Ms. Long was

7  to testify, she would say that she's known Mr. Tingle for over

8  15 years, that her and her husband reside in Brookshire, Texas.

9  I believe the address is Pattison, Texas, 32962 Franklin Brooks

10  Drive in Pattison, Texas, and she has offered her residence as

11  a place for Mr. Tingle to live.

12  I would -- I think Brookshire, Texas from the current

13  residence of this incident is about 45 minutes away. It's in a

14  rural area. Her and her husband are both professionals. She's

15  agreeing to sign on as a third-party custodian in regards to

16  Mr. Tingle. During -- Ms. Long would also testify to during

17  the time since the search warrant to now, Mr. Tingle has

18  received a CDL license and received a certificate for truck

19  driving and had completed two weeks orientation at Schneider

20  Trucking. It would be her testimony that he can continue to

21  work there, live in her home. She wouldn't --

22  THE COURT: What's the relationship to Schneider

23  Trucking?

24  MS. SPARKS: That's the company that he --

25  THE COURT: How can she say that he's going to be

1  able to work there?

2        MS. SPARKS:  Because he has his -- that's where he

3  had completed his two orientation -- his orientation.  He has a

4  certificate, his CDL and we have his employment letter.  And

5  so, she'll make sure he gets back and forth.

6        THE COURT:  She does not work for Schneider Trucking?

7        MS. SPARKS:  She does not.

8        THE COURT:  All right.  Okay.

9        MS. SPARKS:  She does not, Your Honor, but she has

10  employed him in the past.  She is the owner of a nail shop.  At

11  one point, Mr. Tingle did manage her nail shop for about five

12  years before COVID.  So, she's aware of his work ethic, aware

13  of what type of person he is.  She knows that he will go to

14  work.

15        She's also the grandmother of his child and so,

16  she'll make provisions at the Brookshire residence for him to

17  be able to see his child and continue on with that

18  relationship.

19        And at this time, we would like to present the Court

20  with both his CDL license, his certificate for a CDL license,

21  and a job -- an email from one of these employers.

22        THE COURT:  And who did you just proffer for -- the

23  mother or --

24        MS. SPARKS:  The mother-in-law.  His mother-in-law.

25        THE COURT:  In the yellow?

1      MS. SPARKS:  Yes.

2      THE COURT:  Okay.  All right.

3      MS. SPARKS:  And then we would also proffer, Your

4  Honor, on behalf of Ms. Lena Long, and she is the common law

5  wife of Mr. Tingle.  She's been with him for over nine years.

6  She can attest that since 27, he has had no further contact

7  with the criminal justice system, that he is 39 nine years old,

8  will be 40 next year, that she assisted him in obtaining his

9  CDL license, that he does have a passport.  She brought it

10 today.  That he -- she is the mother and he's an active father

11 of his two-year-old.  And that during this time since May, that

12 they've made all kind of changes in getting their life in

13 preparation for him to change his environment completely and

14 she is completely on board with commuting to Brookshire to make

15 sure that their family can continue in that transition.

16     THE COURT:  Is she the one who is present with the

17 two-year-old child at the home at the time of his arrest?

18     MS. SPARKS:  That is correct, Your Honor.

19     THE COURT:  With the drug paraphernalia in the

20 kitchen?

21     MS. SPARKS:  Hence, Your Honor, why we are suggesting

22 that he --

23     THE COURT:  All right.

24     MS. SPARKS:  -- move to Brookshire.

25     THE COURT:  Anything else?

1          MS. SPARKS:  Nothing further, Your Honor, in regards
2    to proffer.

3          THE COURT:  Okay.  I'm ready for argument.

4          MR. MEGGALI:  Your Honor, this is a presumption case
5    and the presumption has not been rebutted.  This is not a case
6    where a cocaine amount was found in a home as a onetime thing.
7    Rather, law enforcement found at least three encounters
8    observed on pole camera or vehicle tracker between the
9    defendant and one or two individuals who are known to traffic
10   cocaine, and whom the defendant admitted to have trafficked
11   cocaine with when interviewed by law enforcement.

12         Although the defendant is not facing a 924(c) charge,
13   three firearms were recovered in his home and as defense
14   counsel astutely noted, they were found in different parts of
15   the home.  However, after several felony convictions and being
16   on notice that he is not allowed to have a weapon, that was not
17   enough to stop him from harboring those firearms and those
18   firearms are there presumably to protect his cocaine stash.

19         While we appreciate what the defense proffered as a
20   potential custodian, a young child was not enough to stop the
21   defendant from harboring cocaine.   A young child and his
22   mother -- and that child's mother was not enough to stop the
23   defendant from harboring firearms, presumably to protect that
24   cocaine, and that child was put in danger, Your Honor, in light
25   of what the defendant was harboring.

1          As far as risk of flight, the government would

2     proffer that there are -- there's at least one serious drug

3     felony on the defendant's criminal history, namely his

4     manufacturing, his first-degree felony, manufacturing drug

5     charge from January 2012.  And that combined with a ten-year

6     mandatory minimum from count two, and a significant maximum

7     penalty in count one incentivizes the defendant to flee.

8          We already saw evasiveness from the defendant when

9     law enforcement first came in May 22nd, 2024.  Detective Krantz

10    testified that he did not admit that he had cocaine until it

11    was discovered and there's at least one instance on the

12    defendant's criminal history where he committed a violation

13    while on parole, namely January -- the January 2012 drug

14    conviction while he was on a six-year parole that was scheduled

15    to end in 2015, from his 2007 conviction.

16          And in light of these factors, Your Honor, the

17    government would submit that the rebuttal presumption has not

18    been overcome.

19          THE COURT:  One second, Ms. Sparks.  So, he was on

20    parole for the 2007 conviction when he was --

21          MR. MEGGALI:  Your Honor --

22          THE COURT:  -- arrest --

23          MR. MEGGALI:  That wasn't clear from my review of the

24    pretrial services report; however, we reviewed the NCIC report

25    and the defense -- Detective Krantz reviewed the NCIC report

1  and to his satisfaction, those days lined up.

2          THE COURT:  When was he released from TDCJ on the

3  2012 conviction?

4          MR. MEGGALI:  While we have the NCIC report here

5  available to admit, we would proffer that he was released in

6  May 2009 while serving an eight-year imprisonment sentence.  So

7  May 15, 2009 is when his parole status began.

8          THE COURT:  Right. And he gets another conviction?

9          MR. MEGGALI:  In January 2012.

10          THE COURT:  In January 2012.  It was a six-year

11  confinement.  When did he get released?

12          MR. MEGGALI:  My apologies, Your Honor.  So, he was

13  sentenced to eight years of confinement in May 23rd, 2007.  And

14  he started parole in May 15, 2009.  And that parole was within

15  an eight-year confinement sentence that began in May 2007.  So,

16  it was scheduled to end in 2015.  And we would refer to the

17  January 2012 conviction for first-degree manufacture or

18  delivery of a controlled substance.

19          THE COURT:  I think I understand all of that.  He was

20  on parole when he was arrested in November of 2011 and

21  convicted in January 2012 for manufacture or delivery.

22          MR. MEGGALI:  Yes, Your Honor.

23          THE COURT:  He was already on parole.  Did he serve

24  six years in TDCJ for that 2012 conviction?

25          MR. MEGGALI:  Your Honor, my notes, what I would

1  proffer is that he began parole in November 20, 2014 for his
2  January 2012.
3          THE COURT:  All right, so 2014.  And how long was
4  that parole period?
5          MR. MEGGALI:  It would have been about three-and-a-
6  half years.
7          THE COURT:  All right.  All right, thank you.  Ms.
8  Sparks.
9          MS. SPARKS:  Yes, Your Honor.  Mr. Tingle doesn't
10 lose the presumption of innocence in all of those times.  The
11 only time that they can consider that he had drugs was the time
12 that it was found in his home, and I think the biggest thing,
13 Judge, is to show who he's been since they came in his home and
14 now when he could have fled.  I think that that is the biggest
15 indicator of his appearance in Court.
16          In regards to safety, Judge, we have his criminal --
17 in regards to safety, we had that he was cooperative, that he
18 spoke with law enforcement, provided them information.  He
19 doesn't have to be forthcoming, but he decided to despite a 5K
20 or any of that in -- any of that.  And from May to now, he knew
21 this wasn't just going to magically disappear, but he stayed.
22 He stayed at the same house.  He didn't run.  He came.
23          His criminal history does not speak to anything
24 violent, anything aggravated.  That's not what his criminal
25 history shows us.  It shows that he's never missed a Court

1    date.  What it shows is what he's done since May is that he

2    went and got a CDL, that he went and got a job, Your Honor,

3    again, showing that he's making steps to turn that corner.

4         And to offer the Court more assurance, put him in a

5    different environment.  Let's put him in Brookshire.  Who he

6    was from 19 to 27, we're hoping he's somebody different at 40.

7    And if we move him out of Harris County to Brookshire with the

8    GPS, with curfew, all of those together are definitely

9    conditions that can show he's going to come to Court and he's

10   going to appear.

11        I believe that we have met the presumption in regards

12   to safety and appearance, but even if the Court finds that we

13   haven't, it has to find that there's no restrictions, there's

14   no conditions that will prevent him from -- the there's no

15   conditions that the Court can assess that can guarantee the

16   safety and the safety in his appearance.  And I believe that a

17   GPS, a Brookshire, a third-party custodian, a curfew, home

18   confinement if need be, he's shown us who he was going to be

19   between May and now, before the Court got involved, before he

20   was actually indicted.

21        If he was going to run, Judge, it was free rein to

22   go.  There -- he wasn't -- he knew the police came to his

23   house.  He talked to them.  He knew this was coming.  He was

24   there.  He was exactly where they thought that they would find

25   him.  They didn't have to go looking for him.  They went to the

1    same residence, and I think that that shows -- and who he was.

2    He didn't just throw his hands up and get violent.  He went and

3    got a job.  He went and got a certificate.  He went and got a

4    CDL.

5            And I think who he showed us who -- he showed us who

6    he was from May through August, and that's who he will be on

7    bond.  And so we're asking the Court to give him a unsecured

8    bond and have his mother-in-law as his third-party custodian.

9            THE COURT:  All right.  Thank you, Ms. Sparks.  These

10   are my findings.  I find that with respect to the presumption

11   of risk of flight, the defendant has met the presumption -- has

12   overcome the presumption by proffering testimony and proffering

13   information about a different place to live, people who would

14   be willing to serve as third-party custodians, although they

15   haven't as far as I know they have not interviewed or qualified

16   as third-party custodians.

17           However, with respect to the danger to community, I

18   don't think that getting a CDL license overcomes the

19   presumption of danger to the community.  I've got testimony

20   that we have a drug-involved premises with the home where his

21   young child and girlfriend are living being used to manufacture

22   drugs which are dangerous.  The conduct and the dealing in

23   narcotics is presumed to be a danger to the community.

24           While I agree he has not fled since his house was

25   searched, what I can see regarding the -- his personal history

1    is that he was maintaining a drug-involved premises with a

2    young child there, and he's got a long history of manufacture

3    or delivery charges.  He violated his probation by committing

4    the same type of criminal conduct while on probation.

5            Those are all things that tell me that he does pose a

6    danger to the community that's not going to be affected by

7    conditions that I can impose.  His girlfriend was present

8    living in the home while this drug related conduct was going

9    on.  I don't think she's going to be able to prevent that and I

10   don't know if his mother-in-law knew it about it or -- knew

11   about it or not, but I don't believe that her presence is going

12   to change that, either.  I -- his past conduct and the

13   endangerment of a child are things that I can consider.  The

14   presumption doesn't just go away.

15           Even if it had been met, I don't think it has in this

16   case, but even if it had been met, I still find that he poses a

17   danger to the community and to specific in individual including

18   the young child.  So, I'm remanding him to the custody of the

19   U.S. Marshals and I will issue a written order later.

20       (Hearing adjourned at 2:57 p.m.)

21                           *  *  *  *  *

22

23

24

25

1                          I N D E X

2

3                           RULINGS

4                                          Page        Line

5   Motion to Unseal Warrants, GRANTED          5           8

6

7   Continuance for Lopez, GRANTED              6           12

8

9   Continuance for Madrigal, GRANTED           8           20

10

11  Detention Hearing, Robledo, Remanded to

12  Custody                                     30          19

13

14  Detention Hearing, Tingle, Remanded to

15  Custody                                     57          18

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, court-approved transcriber,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  September 24, 2024